**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Peter J. Laslie, | ) | |
| | ) | No. 10 C 3031 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| Chicago Transit Authority, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

## Introduction

The Chicago Transit Authority ("CTA") suspended Peter Laslie for 17 days and placed him on probation after he contributed to a train collision on January 1, 2009. Laslie believed he was disciplined more harshly than a co-worker because he is African American and filed a charge of discrimination with the EEOC. On December 12, 2009, less than a year after the accident, Laslie was involved in a second train collision. At that point, the CTA discharged Laslie (at least temporarily; he was later rehired). Laslie filed this lawsuit under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, alleging that (1) the CTA discriminated based on race when it disciplined him for the first collision, and (2) its later decision to discharge him was in retaliation for filing the charge of discrimination with the EEOC. Presently before the Court is the CTA's Motion for

Summary Judgment. R. 68. For the reasons explained below, the CTA's motion is granted.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Egan Marine Corp. v. Great Am. Ins. Co.*, 665 F.3d 800, 811 (7th Cir. 2011). A nonmovant must produce more than "a mere scintilla of evidence" to defeat summary judgment and "must come forward with specific facts demonstrating that there is a genuine issue for trial." *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010) (quoting *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008)). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The following background is a summary of the material facts, viewed in the light most favorable to Laslie.

## Background[1]

Laslie began working for the CTA in October 2001. DSMF ¶ 1; PR ¶ 1. He started off as a combined rail operator, which included train operator, customer assistance, flagging, and switching duties. *Id.* By 2009, Laslie was working as a switchman. DSMF ¶ 2; PR ¶ 2. He worked at O'Hare four days a week and the Forest Park Yard (the "Yard") one day a week. *Id.* Laslie's duties included moving trains around the Yard. DSMF ¶ 3; PR ¶ 3. The Yard has an adjacent train repair facility called the Des Plaines Shop (the "Shop"). DSMF ¶ 4; PR ¶ 4.

### The January 1, 2009 Collision

On January 1, 2009, Laslie was working at the Yard with another switchman, Rosemary Stanciel. DSMF ¶¶ 6-7; PR ¶¶ 6-7. Laslie and Stanciel are both African Americans. DSMF ¶¶ 1, 7; PR ¶¶ 1, 7. The Rail Supervisor and acting Yard Leader on duty was Edward Lomax. DSMF ¶ 7; PR ¶ 7.

A train car—Car 3119—displayed a blue warning light, indicating a failure with the braking system. DSMF ¶¶ 8-9; PR ¶¶ 8-9.[2] Laslie and Stanciel were each aware of the blue warning light. DSMF Ex. 1 at p. 3. Lomax instructed Stanciel to move Car 3119 elsewhere in the Yard. DSMF ¶ 9; PR ¶ 9. Lomax then instructed Laslie to go to the Shop to retrieve a different train. *Id.*

---

[1] The Court cites to Defendant's Local Rule 56.1 Statement of Material Facts, R. 70, as "DSMF ¶ __" or "DSMF Ex. __," Plaintiff's Response to Defendant's Statement of Material Facts, R. 77, as "PR ¶ __," Plaintiff's Statement of Additional Material Facts, R. 78, as "PSMF ¶ __" or "PSMF Ex. __," and Defendant's Response to Plaintiff's Statement of Additional Material Facts, R. 81, as "DR ¶ __."

[2] Throughout this order, the Court uses the term "train" either generally or to refer to a group of cars, and "car" to refer to a particular, individual train car.

At the Shop, Laslie met with Dave Grabski. *Id.* Grabski, a Caucasian, was the lead car repairer in the Shop. DSMF ¶ 10; PR ¶ 10. There was no maintenance manager on duty. PSMF ¶ 1. Laslie asked Grabski, "what train do you want me to get that's ready?" DSMF ¶ 10; PR ¶ 10. Grabski led Laslie to a train with Cars 2291 and 2292. DSMF ¶ 11; PR ¶ 11. Car 2291 did not have any brakes. DSMF ¶ 28; PR ¶ 28. Grabski and Laslie tried various measures to start the train but failed; its battery was dead. DSMF ¶¶ 11-12; PR ¶¶ 11-12; PSMF ¶ 14.

At that point, Grabski radioed Stanciel to bring Car 3119 to the Shop. DSMF ¶ 13; PR ¶ 13. Grabski then instructed Laslie to tell Stanciel to bring Car 3119 over to them so they could hook it up to Cars 2291 and 2292 as a "horse" to push the cars. *Id.* Laslie and Stanciel complied without objection. DSMF ¶ 14; PR ¶ 14.

After the cars were connected, Grabski instructed Stanciel to operate the train from Car 3119. DSMF ¶ 17; PR ¶ 17. Grabski borrowed Laslie's sleet scraper, a tool used to remove sleet, and used it to deactivate the brakes on Car 2292 so that the train could be pushed along. DSMF ¶ 18; PR ¶ 18. At that point, Laslie was acting as a flagman from Car 2291. PSMF ¶ 16 & Ex. 1 ¶ 13. Laslie was aware that Grabski had deactivated the brakes on Car 2292; Stanciel claimed that she did not know. DSMF ¶ 19 & Ex. 1 at p. 3; PR ¶ 19. In sum, Grabski, Stanciel, and Laslie were using a car with brake problems (Car 3119) to push a car with no brakes (Car 2291) and a car with deactivated brakes (Car 2292).

As Stanciel operated the train, the train was slow to stop and collided with the Shop door, which was sticking out by about one foot. DSMF ¶¶ 19-21; PR ¶¶ 19-

4

21. The front Car 2292 sustained some damage, DSMF Ex. 1 at p. 2, and the Shop door had to be replaced entirely. DSMF ¶ 21; PR ¶ 21.

Transportation Manager Mervin McKinney investigated the accident and recommended discipline for Laslie and Stanciel. DSMF ¶ 23; PR ¶ 23. McKinney is also African American. *Id.* McKinney interviewed Laslie and considered Laslie's general defense that although he knew of the blue warning light on Car 3119 and that the brakes on Car 2292 were deactivated, he assisted moving the cars because he was instructed to do so by Grabski. DSMF Ex. 1 at pp. 2-3. McKinney nonetheless concluded that Laslie violated numerous CTA rules and standing orders, including by using a defective car as a "horse." DSMF Ex. 3 at pp. 2-3; DSMF ¶ 23; PR ¶ 23. McKinney charged Laslie with a "Class I Accident" under the CTA's Vehicle Accident Guidelines. DSMF ¶ 24; PR ¶ 24. A Class I Accident involves "serious damage and/or serious injury." DSMF ¶ 26; PR ¶ 26. An employee involved in a Class I Accident is "[r]eferred to the appropriate supervisor for consideration of progressive action up to and including administrative separation." *Id.* An employee involved in a second Class I Accident is "[r]eferred to the appropriate supervisor for administrative separation." DSMF Ex. 2 at p. 2. In part because Laslie was also involved in a Class II accident in July 2007, McKinney decided to refer him to Richard Newton, the General Manager for the Pink and Blue Lines, with a recommendation for discharge. DSMF ¶ 27; PR ¶ 27; DSMF Exs. 1 & 3. McKinney recommended that Stanciel be discharged as well. DSMF Ex. 1 at p. 3.

Newton discharged Stanciel (she was later re-instated) but decided not to discharge Laslie as McKinney recommended. DSMF ¶¶ 29, 31; PR ¶¶ 29, 31.[3] Instead, Newton placed Laslie on a Last Chance Agreement effective January 13, 2009. DSMF ¶ 29; PR ¶ 29. The Agreement explained that "[a]s part of the train movement [on January 1, 2009], you are considered to have had some responsibility in the accident that occurred," and that Laslie had violated numerous CTA rules and standing orders. DSMF Ex. 4 at p. 1. The Agreement then stated that "in lieu of Discharge you will be placed on Probation for accidents until at least January 13, 2011. Any future Class I or class II accident may be grounds for recommendation of discharge." *Id.* at p. 2. Laslie was also suspended for 17 days and went through paid training before he returned to work. DSMF ¶ 30; PR ¶ 30; PSMF ¶ 21.

McKinney testified that he had no authority to discipline Grabski because Grabski worked in the Maintenance Department. DSMF Ex. B at p. 34. Grabski generally reported to Maintenance Manager Tom Ciezadlo. DSMF ¶ 32; PR ¶32. Grabski was later interviewed regarding the January 2009 collision by three managers in the Maintenance Department. DSMF ¶ 34; PR ¶ 34. Grabski was verbally admonished by Inspection Manager John Dowdall to be more safety conscious, but was not otherwise disciplined for the collision. *Id.*

On April 23, 2009, Laslie filed a charge of discrimination with the EEOC. R. 43, Second Am. Compl., Ex. A. The EEOC charge alleged that Laslie's "employer suspended and disciplined [him] for alleged policy violations for a workplace

---

[3] Newton's race is not in the record.

6

incident. A non-Black member was involved in the same incident and was not disciplined or suspended." *Id.* Laslie explained that he "believe[s] [he] has been discriminated against because of [his] race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended." *Id.*

**The December 12, 2009 Collision**

On December 12, 2009, Laslie was again working in the Yard. DSMF ¶ 39; PR ¶ 39. The Yard Leader was Tonisha Sulton. DSMF ¶ 40; PR ¶ 40. Sulton is African American. DSMF Ex. D at p. 45.

That day, Tracks 3 and 4 held 16 cars each, even though each track only has room to safely store 14 cars. DSMF ¶ 41; PR ¶ 41. The extra cars on Track 4 at least partially obstructed Track 3; as a result, a train from Track 4 would have to be moved before a train from Track 3 could be moved safely. *Id.*

 Sulton instructed Laslie to move a train out of the Yard. According to Sulton, she told Laslie to move a train from *Track 2*. DSMF ¶ 42; PR ¶ 42. According to Laslie, Sulton told him to move a train from *Track 3*. DSMF ¶ 43; PR ¶ 43. Laslie proceeded to take an 8-car train from Track 3. DSMF ¶ 39; PR ¶ 39. The first car of the train Laslie was operating cleared the cars that were parked on Track 4, but as Laslie continued to move the train forward, he heard a "screeching noise" as a car in his train made contact with a car on Track 4. DSMF ¶ 44; PR ¶ 44. After the collision, Laslie went to the opposite end of his train and, although no one told him to do so, pulled the train back "to see how much damage was done to the train." DSMF ¶ 47; PR ¶ 47. This move exacerbated the damage; in the process of pulling

the train back, Laslie bent the side railing of one of the trains. *Id.* The total damage to both rail cars was approximately $40,000. DSMF ¶ 56; PR ¶ 56.

Transportation Manager Kenneth Elam investigated the collision. DSMF ¶ 48; PR ¶ 48. Elam is African American. *Id.* Elam ultimately credited Sulton's recollection that she told Laslie to take a train from Track 2. Elam determined that Laslie was responsible for the collision because he failed to take Sulton's direction to take a train from Track 2 and because he exacerbated the damage by pulling the trains apart. DSMF ¶ 58; PR ¶ 58. Elam found that Laslie violated numerous CTA rules and standing orders. DSMF Ex. 14 at pp. 3-5. Elam then concluded:

> As a switchman, it was Mr. Laslie's responsibility to operate trains on sight and to ensure and maintain proper clearance between moving and standing trains to avoid collision. In the instant matter, Mr. Laslie admitted to striking the standing train located on track #4 in Forest Park Yard. Furthermore, his action in pulling the train back without authorization contributed to excessive damage to CTA property.

> In view of the above, there are no mitigating factors such as tenure of service or overall good work record to warrant consideration of a penalty less than discharge. Moreover, Mr. [Laslie] was on probation in lieu of discharge for vehicular accidents at the time the triggering incident took place. Therefore, Mr. [Laslie] is referred to the General Manager, Elevated Lines, December 23, 2009, with a recommend[ation] for discharge.

*Id.* at p. 5.

Elam notified Laslie that he was being recommended for discharge. PR ¶ 61; PSMF ¶ 33. At that time, Laslie discussed the January 2009 collision with Elam

and explained that he filed a charge of discrimination with the EEOC. PR ¶ 61.[4]
Elam told Laslie that he would investigate further and that the matter would be
referred to General Manager Ron Ester for a final decision. *Id.*

On December 23, 2009, Ester notified Laslie that he was being discharged.
DSMF Ex. 15. Ester is also African American. DSMF Ex. D at p. 47. At the
discharge hearing on December 23, Laslie did not tell Ester about the EEOC charge
or that the discipline he received for the January 2009 collision was discriminatory.
R. 81-1, Aff. of Ronald Ester ¶ 6. At the time of Laslie's discharge, Ester was
unaware that Laslie had filed an EEOC charge. *Id.* ¶ 7.

Laslie was eventually re-hired by the CTA and reinstated to his switchman
position. DSMF ¶ 62; PR ¶ 62.

## Analysis

### I. Title VII Discrimination Claim

Under Title VII of the Civil Rights Act of 1964, as amended, it is unlawful for
an employer "to fail or refuse to hire or to discharge any individual, or otherwise to
discriminate against any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such individual's race." 42
U.S.C. § 2000e-2(a)(1). Moreover, in order to prevail, a plaintiff only needs to
demonstrate that "race . . . was a motivating factor for any employment practice,
even though other factors also motivated the practice." *Id.* § 2000e-2(m).

---

[4] According to Elam, Laslie only said that he had filed a grievance with the union
and did not mention the EEOC charge or that he thought the discipline was
discriminatory. R. 81-1, Second Aff. of Kenneth Elam at ¶ 3. For purposes of
summary judgment, the Court assumes that Laslie's account is true.

Laslie alleges that the CTA discriminated based on race when it disciplined him for the January 2009 collision. Laslie seeks back pay for the 17 days he was suspended and other damages.

A plaintiff can establish unlawful discrimination either directly or indirectly. *See, e.g., Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004). Laslie attempts to establish his discrimination claim under both the direct and indirect methods of proof. The Court addresses each in turn.

### A.     Direct Method

As its name implies, the "direct" method of proof focuses on "whether the evidence 'points directly' to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (citation omitted). Under the direct method, a plaintiff "must offer either direct evidence that would prove the fact in question—the discriminatory intent—without reliance on inference or presumption, or a 'convincing mosaic' of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733-34 (7th Cir. 2011) (citations omitted).

A plaintiff using the "convincing mosaic" approach may present three broad types of circumstantial evidence: (1) suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) showing that the employer systematically treated other, similarly situated employees better; and/or (3) showing that the

employer's justification for the adverse action is pretextual. *Id.* at 734; *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003).

Laslie relies exclusively on pretext to establish a "convincing mosaic" of circumstantial evidence. R. 79 at 8-9. Laslie argues at length that "he clearly was not culpable for" the January 2009 collision and that his recommended discharge and eventual 17-day suspension were "unjust." *Id.* at 9-11.

Laslie's pretext argument is fundamentally flawed. An employer's actions might be "unjust," but that does not establish that the employer's justification is a pretext for race discrimination. Courts are not "superpersonnel departments." *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010) (quoting *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005)). As the Seventh Circuit has repeatedly stated, "it is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 691 (7th Cir. 2008) (quoting *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005)). A plaintiff therefore has the burden of establishing that "the employer's proffered reasons are factually baseless, were not the actual motivation for the [adverse action] in question, or were insufficient to motivate the [adverse action]." *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 538 (7th Cir. 2002) (quoting *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888-89 (7th Cir. 2001)). Thus, the "only question" for the Court is "whether [the defendant] had a legitimate, non-discriminatory reason for

[disciplining its employee], not whether it made the correct decision. If it is a true ground and not a pretext, the case is over." *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010) (internal citation omitted).

McKinney (also an African American) recommended that the CTA discharge Laslie as a result of the January 2009 collision, and Newton ultimately placed Laslie on probation following a 17-day suspension. Laslie has not established that McKinney's or Newton's justifications for those actions were factually baseless, not the actual motive for their actions, or were insufficient to motivate their actions. Although Laslie asserts that he was just following Grabski's orders, the fact remains that, as Newton concluded, Laslie still had "some responsibility in the accident that occurred." DSMF Ex. 4 at p. 1. Most significantly, Laslie relayed Grabski's instruction to Stanciel to use Car 3119 as a "horse" to push Cars 2291 and 2292. Notably, in relaying that instruction, Laslie may have been the only one who knew that *none* of the cars had properly functioning brakes. Stanciel knew about the blue warning light on Car 3119, but claimed that she did not know that Grabski deactivated the brakes on Car 2292. Conversely, Grabski knew that he had just deactivated the brakes on Car 2292, but claimed that he did not know about the blue warning light or other defects on Car 3119. DSMF Ex. B at pp. 89-90. Laslie admittedly knew about both the blue warning light on Car 3119 and that Grabski deactivated the brakes on Car 2292. Yet, he said nothing and flagged the train along, where it collided with the Shop door and caused serious damage.

12

Laslie argues that the CTA's Vehicle Accident Guidelines apply only to employees who were actually "operating" a vehicle, and that he was merely a flagman. R. 79 at 9. But the CTA's Rail System Rulebook expressly provides that "[t]he term operating employee includes any employee working as a flagman." PSMF Ex. 3 at R1.1.1. Laslie also cites the Vehicle Accident Guideline provision that "[a]n employee who during a twenty-four (24) month period is involved in any combination of a Class I and Class II Accident is subject to Administrative Separation for any subsequent accident," DSMF Ex. 2 at p. 2, and argues that he only should have been recommended for discharge after a third accident. R. 79 at 9-10. But that is not the only circumstance where discharge is allowed. The Vehicle Accident Guidelines expressly provide that after one Class I accident, an employee is "[r]eferred . . . for consideration of progressive action *up to and including administrative separation*." DSMF Ex. 2 at p. 2 (emphasis added). Finally, Laslie notes that Grabski only received a verbal reprimand. R. 79 at 10-11. But as discussed below, Grabksi was not a similarly situated employee—he reported to and was ultimately disciplined by the Maintenance Department. And if the CTA believed his account, Grabski did not know that Car 3119 was defective.

In short, like the plaintiff in *Lucas*, 367 F.3d at 731, Laslie "may believe that his suspension was incorrect, ill-advised, or undesirable; he has not established, however, that the CTA did not honestly believe [its justification]." (Internal citation omitted.) As a result, Laslie has not established pretext, and offers no other evidence to establish a discrimination claim under the direct method of proof.

### B.    Indirect Method

The indirect method of proof involves three steps. First, the plaintiff must establish a *prima facie* case by demonstrating that: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated employees outside of the protected class more favorably. For a discriminatory discipline claim, like Laslie asserts here, the second and fourth prongs merge together. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008). Thus, instead of needing to show that he performed his job satisfactorily, a plaintiff must establish "that he received dissimilar—and more harsh—punishment than that received by a similarly situated employee who was outside the protected class." *Lucas*, 367 F.3d at 728. Second, if a plaintiff establishes a *prima facie* case, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for the employment action. This has been described as "[a] light burden." *Stockwell*, 597 F.3d at 901. Third, once the employer has produced a legitimate, nondiscriminatory reason for its decision, the plaintiff then has the burden of producing sufficient evidence to show that reason to be pretextual. *Id.*

As discussed above with respect to the direct method of proof, the CTA has produced legitimate, nondiscriminatory reasons for its decision to discipline Laslie for the January 2009 collision, and Laslie has not produced sufficient evidence to show pretext. As a result, Laslie cannot prevail under the indirect method of proof either. In addition, Laslie would not even be able to advance to steps two and three

of the indirect proof analysis because Laslie has not established a *prima facie* case of discrimination. In particular, he has not identified any similarly situated non-African American employee who was disciplined more leniently than himself.

A plaintiff has the "burden . . . to establish the similarity between himself and the proposed comparable employees." *Peters*, 307 F.3d at 546. Although a similarly situated employee need not be "identical," *Caskey*, 535 F.3d at 592, he must be "directly comparable to the plaintiff in all material respects." *Naik*, 627 F.3d at 600 (quoting *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009)). As the Seventh Circuit has explained,

> in disciplinary cases – in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason – a plaintiff must show that he is similarly situated with respect to performance, qualifications and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating and mitigating circumstances as would distinguish their conduct or the employer's treatment of them.

*Peters*, 307 F.3d at 546 (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)). *See also Gates*, 513 F.3d at 690.

Laslie holds out Grabski as a non-African American employee who was disciplined more leniently for the January 2009 collision. Grabski was certainly disciplined more leniently, but he is not similarly situated. Laslie is in operations and Grabski is in maintenance; they report to entirely different chains of command. There is no dispute that Laslie's discipline was handled by Transportation Manager

McKinney and General Manager Newton, while Grabski's discipline was handled within the Maintenance Department. This setup may very well lead to uneven discipline decisions, but it does not support a Title VII claim for race discrimination.

Laslie argues that McKinney—in his role as Incident Commander after the collision—*could* have interviewed or perhaps disciplined Grabski. R. 79 at 10-11, 13. Laslie's argument is unavailing. As an initial matter, to the extent McKinney had discretion to discipline Grabski (McKinney testified he did not), Laslie has not submitted any evidence or even suggested that McKinney's decision to leave Grabski's discipline to the Maintenance Department had anything to do with race. And in any event, Laslie has not submitted any evidence showing that McKinney (or Newton) had authority to discipline Grabski. With respect to McKinney, Laslie cites Standard Operating Procedure 8191 and Rule 1.2 of the CTA's Rail System Rulebook. R. 79 at 10; PSMF Ex. 7; DSMF Ex. 6. Neither says anything about imposing discipline. With respect to Newton, Laslie merely argues in conclusory fashion that "it is beyond belief" that Newton did not have the authority to discipline Grabski. R. 79 at 13. Laslie's conjecture is not evidence.

In short, Laslie has not established a *prima facie* case because he has not shown that he received harsher punishment than a similarly situated non-African American employee. And even if Laslie could establish a *prima facie* case, he has not submitted evidence that the CTA's justification for disciplining him is a pretext. Laslie's discrimination claim therefore fails under the indirect method.

## II.     Title VII Retaliation Claim

Laslie does not contend that his December 23, 2009 discharge was the result of discriminatory discipline for the December 2009 collision. Instead, Laslie alleges that the CTA discharged him in retaliation for filing his April 23, 2009 charge of discrimination with the EEOC regarding the January 2009 collision. Laslie seeks compensation for lost pay and benefits after he was discharged and other damages.

Under Title VII of the Civil Rights Act of 1964, as amended, it is unlawful for an employer "to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a). As with a Title VII discrimination claim, a plaintiff can establish unlawful retaliation either directly or indirectly. Again, Laslie attempts to establish his retaliation claim under both the direct and indirect methods of proof.

### A.     Direct Method

To prove a retaliation claim under the direct method, a plaintiff is required to establish that: (1) he engaged in protected activity; (2) his employer took an adverse action against him; and (3) there is a causal connection between the plaintiff's protected activity and the adverse employment action. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011).

Laslie easily meets the first two elements. He engaged in protected activity when he filed his charge of discrimination with the EEOC on April 23, 2009. The CTA also took an adverse action against Laslie when it discharged him (at least

temporarily) on December 23, 2009. The key issue here is the third element—whether there is a causal connection between these two events.

The CTA discharged Laslie eight months after he filed his charge of discrimination with the EEOC. As a general matter, the passage of eight months is too long to infer retaliation. *See, e.g., O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011) (holding that the passage of 60 days "is not strongly suggestive of retaliation"); *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 398 (7th Cir. 1999) (holding that plaintiff failed to show retaliation after four months and explaining that "[a] substantial time lapse between the protected activity and the adverse employment action 'is counter-evidence of any causal connection'") (quoting *Johnson v. Univ. of Wis.-Eau Claire*, 70 F.3d 469, 480 (7th Cir. 1995)); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) ("As the period of time separating the two lengthens, the hint of causation weakens. Davidson's discharge occurred five months after she filed her charge of discrimination, and we have previously concluded that when so much time passes before the adverse action takes place, the order in which the events occurred does not by itself suggest a causal link between them.") (internal citation omitted).

This is not a case where a plaintiff might still prove retaliation after such a lengthy period of time. First, the December 2009 collision—which caused nearly $40,000 in property damage—was Laslie's second Class I Accident in less than a year. His discharge was all but certain. The CTA's Vehicle Accident Guidelines provide that an employee involved in a second Class I Accident is "[r]eferred to the

18

appropriate supervisor for administrative separation." DSMF Ex. 2 at p. 2. Laslie was also still on probation from the January 2009 collision; his aptly-named "Last Chance Agreement" provided that "Any future Class I or class II accident may be grounds for recommendation of discharge." DSMF Ex. 4 at p. 1. Second, Laslie has not presented any evidence that Elam or Ester (both African Americans) were motivated by Laslie's filing of an EEOC charge when they recommended or decided Laslie's discipline for the December 2009 collision. Indeed, it is undisputed that Elam decided on his discharge recommendation before he even knew of the EEOC charge and that Ester never knew of the EEOC charge at all.

Laslie takes issue with the fact that Elam decided to credit Sulton's recollection of the December 2009 collision over Laslie's and argues that Elam conducted a "sham investigation." R. 79 at 14-15. But that is not evidence of retaliation for filing an EEOC charge. As discussed above, it is undisputed that Elam conducted that supposedly "sham" investigation and decided on his discharge recommendation before he even knew that Laslie had filed an EEOC charge in April 2009. Laslie also cites a statement from Ester the day Laslie was discharged, where Ester told Laslie that he "knows that it doesn't make any sense but you should not take it personally" and that "the decision came from up top and there is nothing I can do about it." R. 79 at 15.[5] But this does not suggest a retaliatory or other improper motive. Laslie had just been involved in a second train collision in less

---

[5] Ester denies ever saying this, R. 81-1, Aff. of Ronald Ester ¶ 6, but again, for purposes of summary judgment, the Court assumes that Laslie's account is true.

than a year that caused nearly $40,000 in damage to CTA property. It certainly would not be surprising if those "up top" wanted him discharged.

Laslie has not presented any direct evidence or a "convincing mosaic" of circumstantial evidence to support an inference that Elam or Ester retaliated against him for filing an EEOC charge in April 2009. As a result, Laslie cannot establish his retaliation claim under the direct method of proof.

### B.     Indirect Method

To prove a retaliation claim under the indirect method, a plaintiff must first establish a *prima facie* case by demonstrating that "(1) after lodging a complaint about discrimination, (2) only he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) he was performing his job in a satisfactory manner." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002)). As discussed above, in cases involving disciplinary decisions, the second and fourth elements merge. If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate reason for the adverse action, which the plaintiff must then rebut with evidence of pretext. *Vance v. Ball State Univ.*, 646 F.3d 461, 473 (7th Cir. 2011).

Laslie has not presented evidence of pretext. Once again, Laslie asks the Court to act as a superpersonnel department and second-guess the results of the CTA's investigation into the December 2009 collision. But Laslie cannot establish that Elam's or Ester's justifications were factually baseless, not the actual motive

20

for their actions, or were insufficient to motivate their actions. Again, before Elam even knew that Laslie had filed an EEOC complaint, he investigated the December 2009 collision and decided to credit Sulton's recollection that she told Laslie to take a train from Track 2, not Track 3. Moreover, even if Elam believed Laslie's account that Sulton told him to take a train from Track 3, Laslie still readily admits that after the initial collision, he moved the train before investigators arrived and caused additional property damage. Coupled with Laslie's prior Class I Accident, Elam and Ester had ample grounds for their actions. Laslie therefore cannot establish a retaliation claim under the indirect method of proof.

## Conclusion

Laslie has failed to demonstrate any genuine issue of material fact on his Title VII claims. The Court understands Laslie's frustration that Grabski largely escaped discipline for the January 2009 collision. But Laslie has not presented even a scintilla of evidence that race was a motivating factor for the CTA's disciplinary decisions for the January 2009 collision, or that his December 23, 2009 discharge was retaliation for filing an EEOC complaint in April 2009. The CTA's Motion for Summary Judgment, R. 68, is granted in its entirety. This action is dismissed with prejudice.

ENTERED:

_Thomas M Durkin_
Honorable Thomas M. Durkin
United States District Judge

Dated: March 22, 2013

21